IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ELLEN KENNEDY,

                       Plaintiff,                           OPINION AND ORDER

    v.

                                                    18-cv-421-wmc

ANDREW SAUL,
Commissioner of Social Security,

                       Defendant.

Plaintiff Ellen Kennedy is 51 years old and a former musician, performer, and traveling minister. She seeks judicial review of an adverse decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g).[1] More specifically, Kennedy is challenging a final decision issued on April 27, 2017, by Administrative Law Judge ("ALJ") Michael Schaefer, who determined that although Kennedy has a number of limitations related to her physical and mental impairments, those limitations did not prevent her from performing a limited range of sedentary jobs existing in significant numbers in the national economy. Accordingly, the ALJ concluded that Kennedy was neither entitled to Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423(d), nor to Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381a, 1382c.

---

[1]As now reflected in the caption above, Andrew Saul has succeeded Nancy Berryhill as the Commissioner of the Social Security Administration and has become the named defendant in this case. *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party. Later proceedings should be in the substituted party's name.").

On review, Kennedy argues that the ALJ failed to give proper consideration to a number of medical opinions, which show she has more severe limitations than the ALJ found in assessing her residual functional capacity ("RFC"). The court held a telephonic hearing on August 20, 2019, at which the parties appeared by counsel. Having now considered Kennedy's challenges to the ALJ's decision in light of the record and the parties' arguments at the hearing, the court finds that the ALJ did not err in his evaluation of Dr. Hoffmann's opinion or in his determination of Kennedy's physical limitations. With respect to Kennedy's mental limitations, however, the ALJ's decision fails to grapple with significant evidence that arguably supports finding more severe limitations. Thus, he failed to build the accurate and logical "bridge" between the evidence and the ALJ's ultimate conclusion that Kennedy is not disabled as required by Seventh Circuit case law. Accordingly, this case must be remanded for a new RFC assessment as to Kennedy's mental health.

## BACKGROUND[2]

### A. General Overview

Kennedy contends she is unable to work because of chronic, widespread muscle and joint pain and fatigue attributable to Lyme's Disease, for which she was diagnosed presumptively and treated after being bitten by a tick in the summer of 2010. Her condition has alternatively been diagnosed as fibromyalgia or chronic fatigue syndrome. Kennedy also has a long-standing history of depression and anxiety, and more recently was diagnosed with borderline personality disorder. Her mental state worsened after the 2008

---

[2]The following facts are drawn from the administrative record ("AR"). (Dkt. #7.)

death of her father, who was the charismatic founder of a communal religious group of which she had been a member since her twenties. After her father died, Kennedy was ostracized from the church community and forced to adapt to life in the "real world," a process she has found exceedingly difficult despite of years of psychotherapy.

## B. Medical Evidence

### 1. Steven Benish, Ph.D, Consulting Psychologist

On April 22, 2014, Kennedy saw Stephen Benish, Ph.D., a psychologist, for a consultative exam at the request of the Disability Determination Bureau. (AR 928-31.) Kennedy reported being unable to work because she was depressed, cried without provocation, was sensitive to smells, and avoided public places. She further described her mood over the previous two weeks as "abandoned and worthless," and she endorsed vegetative symptoms of diffuse pain, easy fatigue, and poor appetite.

During his mental status evaluation of Kennedy, Benish noted her "dysthymic affect," while also finding that she: had normal, spontaneous speech; was cooperative and non-aggressive; did not demonstrate any factitious or malingering behaviors; was able to accurately state the date, year, location, and season; was able to follow conversation; demonstrated adequate judgment; and denied plans to harm herself or others. Kennedy also had adequate recall and concentration, spelling "world" backward and forward and completing a 3-step command. Describing her thought content and perceptions, Benish noted that Kennedy admitted having auditory hallucinations of a voice telling her to kill herself and envisioning herself slashing her arm open. Kennedy reported that this had

occurred "during a particularly strong phase of depression during Christmas of 2013." (AR 929.) Benish further noted that Kennedy "has some unusual beliefs relevant to religion and markedly different from what most persons would consider logical." (*Id.*) With regard to her stream of mental activity, Benish again noted that although Kennedy had a coherent thought process, "her logic is unusual regarding physics, 'reality', and religion." (*Id.*) Finally, Benish noted that Kennedy reported recently becoming disoriented twice while driving, as well as "symptoms of dissociation." (*Id.*)

From this mental status evaluation, interviews with Kennedy and her husband, and review of psychotherapy records, Benish concluded that Kennedy had the following mental impairments: (1) major depressive disorder, recurrent, severe with psychotic features; (2) depersonalization/derealization disorder; and (3) delusional disorder, grandiose type (psychic powers) of unknown duration. With respect to the depersonalization/derealization disorder, Benish found that Kennedy "experiences persistent and recurrent episodes of depersonalization and derealization," during which she "experiences unreality, detachment, and a sense of being outside of herself with respect to her thoughts, feelings, body, and actions." (AR 930.) While Benish wrote that Kennedy "experiences delusions lasting more than one month," he also observed that apart from the impact of the delusions, her "functioning is not markedly impaired, nor bizarre or odd." (*Id.*)

Ultimately, Benish offered the following opinions regarding Kennedy's work capacity:

- she retained "most" abilities to understand, remember, and carry out simple instructions;

- she had had "some discord" in relationships with supervisors and coworkers;

- she has "significant" problems in concentration, attention and work pace; and

- she has "below average" abilities to respond to stressors.

Psychologist Benish did not explain the basis for any of these conclusions.

### 2. State Agency Psychological Consultants Gilyot-Montgomery and Kleinman

On April 29, 2014, state agency psychologist Erika Gilyot-Montgomery, Psy. D, reviewed Kennedy's functional reports and her medical record, including Benish's consultative evaluation and two-and-a-half years' of psychotherapy records from The Psychology Clinic, where Kennedy had received ongoing treatment. Evaluating the evidence under the "B" criteria of the listings for affective disorders, schizophrenia and other psychotic disorders, and personality disorders, Gilyot-Montgomery concluded that Kennedy had: mild difficulties in daily activities; moderate difficulties in social functioning; moderate difficulties in maintaining concentration, persistence and pace; and no repeated episodes of decompensation.

Gilyot-Montgomery then assessed Kennedy's mental residual functional capacity, finding that Kennedy had "moderate" limitations in the following work-related abilities:

- understanding, remembering, and carrying out detailed instructions;

- maintaining attention and concentration for extended periods;

- working in coordination with or in proximity to others without being distracted by them;

- completing a normal workday and workweek without interruptions from psychologically based symptoms; and

- performing at a consistent pace without an unreasonable number and length of rest periods.

Asked to explain these limitations in "narrative form," Gilyot-Montgomery explained that Kennedy was "capable of sustaining simple, 1-3 step tasks given routine breaks, untimed tasks & superficial contact [with] others in a work setting." AR 134. She further opined that Kennedy "would do best [with] infrequent changes in routine & minimal work-related responsibilities." (AR 135.)

Another state agency consultant, Stephen Kleinman, M.D., affirmed this conclusion on February 5, 2015, noting that Kennedy had not alleged and her records had not shown any worsening of her mental condition since Gilyot-Montgomery's April 2014 RFC assessment. (AR 151, 157.)

### 3. State Medical Consultants Yacob Gawo and Pat Chan

On January 18, 2014, and January 29, 2015, respectively, Drs. Yacob Gawo and Pat Chan reviewed Kennedy's medical records and assessed her physical residual functional capacity. Both doctors concluded that Kennedy was able to perform sedentary work, but that she could perform only: occasional climbing of ramps or stairs; no climbing of ladders, ropes or scaffolds; occasional crouching; occasional crawling; and frequent balancing, stooping and kneeling. (AR 113, 154.)

### 4. St. Mary's Hospital Inpatient Admission

On April 8, 2015, Kennedy was admitted to the inpatient psychiatric unit at St. Mary's Hospital after presenting to the emergency department with suicidal ideation. (AR 1090-1101.) After conducting a mental status evaluation and taking a history from Kennedy, psychiatrist Frederick Langheim, M.D., found that she met the criteria for a primary diagnosis of Borderline Personality Disorder with auditory hallucinations, self harm behaviors and affective instability. He also diagnosed depressive disorder and anxiety disorder with probable somatization, noting that Kennedy was "deeply invested in her multiple diagnosis [sic]." (AR 1096.)

Kennedy remained in the hospital for three days. During her stay, her providers adjusted her medications, provided AODA counseling for her marijuana use, and initiated dialectical behavioral therapy (DBT).

### 5. Psychologist Keri Lehman, and Psychotherapist Kristine Merrill

On May 5, 2015, Psychotherapist Kristine Merrill completed a "Medical Source Statement of Ability to do Work-Related Activities (Mental)," rating Kennedy's abilities on a five-point scale ranging from "none" to "extreme." (AR 1060-62.) The form was co-signed by Keri Lehman, Ph.D., a supervising psychologist. Kennedy began treatment at The Psychology Clinic in March 2011, where Merrill and Lehman both began seeing her. In particular, Kennedy established a relationship with Merrill, who regularly provided psychotherapy to Kennedy from March 2011 until the end of 2015. During her treatment at The Psychology Clinic, Kennedy had been diagnosed with and treated for major

depression, recurrent and severe.  (AR 844-45.)

According to the mental health form, the term "moderate" was defined as "more than a slight limitation in this area but the individual is still able to function satisfactorily"; "marked" meant "a substantial loss in the ability to effectively function"; and "extreme" meant "no useful ability to function in this area."  Both Merrill and Lehman found that Kennedy had "moderate" limitations in the following work-related abilities:

- making judgments on simple work-related decisions;

- interacting appropriately with supervisors;

- interacting appropriately with co-workers; and

- responding appropriately to changes in a routine work setting.

Merrill and Lehman further found that Kennedy had a "marked" limitation in her ability to respond appropriately to work pressures in a usual work setting.  Elaborating, Merrill also wrote that Kennedy's

> emotional/psychological coping skills for stress, change & conflict resolution is severely impaired.  Overall this impairment has typically not manifested in a workplace or public setting.  It manifests in a form of depressive behaviors such as self-abuse, poor self confidence, excessive sleeping.  I observe this from a psycho-therapeutic perspective and I am not clear about how her serious physical ailments would affect her poor performance in this area.

(AR 1061.)  Merrill added that Kennedy was very limited in her capability for social interactions, noting that she had "very limited and overall unhealthy personal relationships."  *Id.*

### 6. Dr. J. G. Hoffmann

Finally, on May 15, 2015, Dr. J.G. Hoffmann also completed a work assessment form on which he indicated that Kennedy could occasionally lift or carry 10 pounds "with extreme effort," could stand or walk less than 2 hours in an 8-hour workday, used a cane for ambulation, would need to periodically alternate periods of sitting with standing to relieve discomfort, had limited ability to push or pull with her upper and lower extremities, and could never reach overhead, perform fingering activities, balance, crouch, crawl or stoop. (AR 1063-66.) Dr. Hoffmann, a purported "chronic Lyme specialist" in Waupaca, Wisconsin, had treated Kennedy between January 27, 2014, and February 16, 2015. (AR 972, 974, 1461.) At that time, Dr. Hoffmann had had Kennedy complete an extensive symptom questionnaire, and he took a brief history from her about her diagnosis and treatment. His handwritten notes on the "physical examination" portion of this form indicated that Kennedy had neck and back spasms, "distal paresthesias" in her extremities, a "crawling sensation" in her muscles, and multiple trigger points in her back. Dr. Hoffmann prescribed a long course of antibiotics, adjusting them periodically. Along with his work assessment form, Dr. Hoffmann further submitted an "informational letter" providing a general overview of Lyme's disease, noting that (1) it was often mistaken for fibromyalgia, (2) it could affect "every tissue and every major organ system in the body," (3) it could not be confirmed by laboratory tests because of the frequency of false negative results, and (4) its symptoms could vary from day to day or hour by hour. (AR 975.)

### C. Administrative Proceedings and ALJ Decision

Kennedy applied for both DIB and SSI on June 19, 2013, alleging that she was

disabled since July 15, 2010, as a result of her physical and mental impairments. After the local disability agency denied her application, initially and on reconsideration, Kennedy sought a hearing before ALJ Schaefer. At that hearing, Kennedy testified the main reason she couldn't work was because she had widespread muscle and joint pain and muscle spasms that affected her "entire back," her hands, and the front of her shins and feet. She also reported having extreme pain behind her right eye, and flu-like symptoms such as fevers, chills, dizziness and swollen glands. (AR 66-67.) She further testified that her next-most disabling symptom was fatigue, which caused her to have weak quadriceps, heart palpitations, and insomnia. (AR 67.) Her third problem, she testified, was the "psych symptoms," which she described as follows:

> I wake up crying without even being fully awake yet. I start off the day by vigorous shaking, anxiety. And this is unprovoked with no thoughts. I have fear of, quite frankly, being in the world since I left the Academy. I don't know how else to say it.

(AR 70.) Kennedy also said she had "outbursts crying," sometimes in public. (AR 71.) Finally, Kennedy testified to being bedridden approximately two to three days a week from extreme pain and depression. (AR 79.)

After considering Kennedy's testimony, additional statements from her husband and daughter, the voluminous medical record, and the medical opinions concerning Kennedy's work-related abilities, ALJ Schaefer issued a decision on April 27, 2017, finding that Kennedy was not disabled at any time from her alleged onset date through the date of his decision. (AR 16-34). Following the Commissioner's five-step sequential evaluation process, the ALJ specifically found that: (1) Kennedy had not engaged in substantial

gainful activity after her alleged disability onset date of July 15, 2010; (2) she had the severe impairments of fibromyalgia/chronic fatigue syndrome, history of positive Lyme's disease testing, major depression, personality disorder, and schizophrenic delusionary disorder; (3) none of her impairments singly or in combination were severe enough to meet or equal the severity of any of the impairments listed in 20 CFR Part 404, Subpart P, App. 1 ("the Listings"); (4) she was unable to perform her past relevant work as an actress/singer and performer/musician; and (5) considering Kennedy's age (42 at the alleged date of onset, 49 at the time of decision), college education, work experience, and residual functional capacity, Kennedy was able to make a vocational adjustment to other work existing in significant numbers in the national economy, including order clerk (89,000 jobs), officer worker (99,000 jobs), and surveillance video monitor (101,000 jobs).

Although the ALJ did not find Kennedy's allegations of chronic, debilitating symptoms to be fully supported by the evidence, he did find that her work abilities were limited in numerous ways. With respect to physical limitations, the ALJ found that Kennedy could perform only sedentary work with a sit/stand option at will and use a cane for walking over uneven terrain or for more than 50 feet. The ALJ also found that she had several additional postural and environmental limitations. With respect to mental limitations, the ALJ further found that Kennedy was limited to work requiring the following:

> • understanding, remembering and carrying out only simple instructions;
>
> • performing routine, repetitive tasks;
>
> • no fast-paced production requirements;

- only simple work-related decisions or judgments;

- few, if any, changes in work duties;

- only occasional, brief, and superficial interactions with the general public or co-workers; and

- occasional interaction with supervisors.

Finally, the ALJ found that Kennedy was "able to attend work, pay attention, and concentrate at work tasks within tolerable limits in the competitive economy." (AR 24.)

Kennedy argues that in arriving at these findings, the ALJ failed to properly weigh the various medical opinions in the record concerning her work-related limitations. The ALJ's treatment of these opinions is discussed in the context of the analysis below.


## OPINION

The standard by which a federal court reviews a final decision by the Commissioner of Social Security is well settled. Findings of fact are "conclusive," so long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When reviewing the Commissioner's findings under § 405(g), the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the ALJ. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Thus, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the Commissioner. *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993).

At the same time, the court must conduct a "critical review of the evidence" before affirming the Commissioner's decision, *Edwards*, 985 F.2d at 336. If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, then the court must remand the matter. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Indeed, even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th 2006).

Here, the ALJ's findings at steps one through four of the evaluation process are not in dispute. What is in dispute is the ALJ's residual functional capacity assessment, and more specifically, whether he properly evaluated the various medical opinions in arriving at his conclusion about what Kennedy could do in spite of her impairments.

Under the Commissioner's rules for adjudicating disability claims, ALJs must evaluate every opinion in the record. In general, the rules that govern plaintiff's claim provide that opinions from medical sources who have regularly treated the claimant are entitled to more weight than non-treating sources. 20 C.F.R. §§ 404.1527(c), 416.927(c). In particular, a treating source's medical opinion on the nature and severity of the claimant's impairment is entitled to "controlling weight" so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent

with the other substantial evidence in [the] record." *Id*.[3] If the ALJ does not give the treating source's opinion controlling weight, then he or she must decide how much weight to give it based on the length, frequency, nature and extent of the treatment relationship, the treating source's area of specialty, and the degree to which the opinion is consistent with the record as a whole and supported by relevant evidence. *Id*. An ALJ must also articulate "good reasons" for discounting a treating physician's opinion. *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011).

## I. Reliance on Dr. Hoffmann's Evaluations

In his decision, the ALJ gave extensive consideration to Dr. Hoffmann's reports. AR 28-30. With respect to the informational letter, the ALJ gave it "little weight," observing that it was "educational only" and did not provide any information specific to plaintiff's work-related abilities. (AR 28.) The ALJ explained, however, that he considered the information in the letter "generally in evaluating the limitations which might be found in persons with Lyme's disease" (AR 28-29), and that, in crafting his RFC, he had "attempted to incorporate limits that do account for Dr. Hoffmann's over-arching position that the diagnosis affects all functioning." (AR 30.)

As for the specific limitations endorsed by Dr. Hoffmann, the ALJ gave them "some weight, but not great or controlling weight." (AR 29.) Although the record as a whole

---

[3]The Social Security Administration recently modified this rule to eliminate the "controlling weight" instruction. See 20 C.F.R. § 404.1520c ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)..., including those from your medical sources."). However, the new regulations apply only to disability applications filed on or after March 27, 2017. Plaintiff's applications in this case were filed in 2013. Accordingly, the ALJ was required to apply the former treating physician rule when deciding plaintiff's applications.

supported a finding that plaintiff was capable of performing less than the full range of sedentary work, the ALJ noted that the record did not support some of the "extreme" limits that Dr. Hoffmann had endorsed.  In particular, the ALJ noted, Dr. Hoffmann had said that plaintiff could "never" perform postural activities, reach overhead or use the fingers to feel, but he had offered no explanation or objective support for such extreme limitations beyond noting plaintiff's Lyme's diagnosis.  Moreover, the ALJ found Dr. Hoffmann's assessment inconsistent with plaintiff's ability to function in her home and community. In contrast, the ALJ gave significant weight to the opinions of state disability medical consultants Dr. Gawo and Dr. Chan that plaintiff could perform sedentary work with a number of postural limitations.

As an initial matter, plaintiff asserts in passing that the ALJ should have given "controlling weight" to Dr. Hoffmann's opinion.  (Plt.'s Br. (dkt. #10) 12.)  Such "perfunctory and undeveloped arguments" are waived. *Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues).") (quoting *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991)).  Regardless, Dr. Hoffmann's conclusion neither explicitly stated that plaintiff could not perform full-time work nor can that opinion be reasonably inferred from Hoffmann's report, notwithstanding plaintiff counsel's arguments to the contrary during the telephonic hearing before this court.  Instead, Dr. Hoffmann "opin[ed] that the claimant could stand, walk or sit for a period of time consistent with an eight hour work day," provided she was able to alternate "periodically" between sitting and standing to relieve pain.  (AR 29.)

Even so, Dr. Hoffmann did endorse some extreme limitations that would arguably reduce significantly the jobs identified by the vocational expert, such as an inability to use her hands for fingering, to reach overhead, to balance and to stoop. Accordingly, the court will address plaintiff's challenges to the ALJ's evaluation of Dr. Hoffmann's actual opinion.

Mainly, plaintiff argues that the ALJ erred by rejecting Dr. Hoffmann's opinion on the ground that it was based on plaintiff's subjective complaints rather than objective findings. Because Lyme's disease is largely diagnosed based on the patient's subjective symptoms just like fibromyalgia, plaintiff suggests that it was improper for the ALJ to discount Dr. Hoffmann's opinion to the extent that he relied on those symptoms. Since the ALJ did not reject Dr. Hoffmann's conclusion that plaintiff has Lyme's Disease, nor that it affects nearly every aspect of her functioning, this argument is unpersuasive. Indeed, relying largely on Dr. Hoffmann's report, the ALJ found that numerous physical restrictions were appropriately placed on plaintiff's ability to function, including the need for a sit/stand option, the ability to use a cane when ambulating more than 50 feet, and limited postural activities, such as bending, reaching, crawling and so on.

What the ALJ rejected were Dr. Hoffmann's more extreme limitations -- namely, a total inability to perform various postural activities, reach overhead, or use the fingers to feel -- a conclusion reasonable minds could easily disagree on this record. In particular, the fact that plaintiff has a disease diagnosed mainly on the basis of subjective symptoms did not excuse Dr. Hoffmann from confirming the severity of those symptoms through medical examinations or tests. *Elder v. Astrue*, 529 F.3d 408, 416 (7th Cir. 2008) ("[I]t makes no difference if Elder saw Dr. Hanus 'every two-and-a-half months'; what does matter is that

Dr. Hanus did not confirm the severity of Elder's fibromyalgia with medical examinations or tests."); *see also* 20 C.F.R. § 404.1527(d)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion.").

Admittedly, Dr. Hoffmann purported to cite a number of "medical findings" on the RFC assessment form, including "multiple pain sites, joints & muscles, trigger points, back, twitching, tremor, paresthesias, disequilibrium, cranial nerve sensitivities, r. sided Bell's Palsy, generalized weakness, poor muscle tone, [decreased] proprioreception." AR 1064. However, these "findings" appear to be drawn almost wholly from plaintiff's subjective reports, and although *not* a basis to reject a "treating doctor's opinion outright, it" may be properly discounted . . . if it is based upon the claimant's subjective complaints rather than objective medical evidence." *Ghiselli v. Colvin*, 837 F.3d 771, 776 (7th Cir. 2016) (citations omitted). Further undermining the weight to be given Dr. Hoffmann's opinion is the fact that he appears to have examined plaintiff on only *three* occasions before completing the RFC form in May 2015, and those examinations reveal minimal clinical findings. For example, on February 16, 2015, Dr. Hoffmann noted that plaintiff had full range of motion in her extremities with no deformities, but there are no notes of any testing that would explain how he determined that plaintiff could never reach overhead or use her fingers for handling, much less limited in so many other of her physical abilities.

Moreover, Hoffmann's findings are further undermined by the records of physical examinations by other medical providers around this same time period, which reveal few abnormalities. *See, e.g.* AR 1185 (physical examination notes from March 17, 2015, by nurse practitioner Mary Wolff noting that plaintiff had full range of motion in her joints,

without evidence of inflammation, deformity or effusion). As the ALJ also pointed out, the degree of limitation expressed by Dr. Hoffmann is further inconsistent with plaintiff's reported ability to function in her home and in her community. These activities, discussed in the ALJ's decision, include the following:

- In 2013, plaintiff completed training to become an aesthetician and performed that job at a resort part time for three months, quitting after reportedly passing out at work after she had to walk a long distance.

- On a September 2013 Function Report, plaintiff stated, among other things, that she could drive a car, pay bills, count change, use a checkbook, grocery shop, and surf the internet.

- In February 2015, she traveled to California to pursue holistic treatment.

- In April 2015, she auditioned for a part in a musical.

- In May 2015, plaintiff told her nurse practitioner that she had been singing and performing with her husband.

- In December 2015, she reported that she planned to take a trip to Florida to do some teaching as well as visit some friends.

As the ALJ reasonably inferred from these activities, plaintiff's ability to perform a number of activities using her hands and fingers (driving, using a computer, grocery shopping), travel fairly long distances, and sing and dance suggests an individual far less impaired than Dr. Hoffmann's form suggests. Given the dearth of *objective* medical findings and seemingly contrary medical and anecdotal evidence, the ALJ could reasonably determine that Dr. Hoffmann appeared to be advocating for plaintiff, rather than objectively diagnosing her condition, and that his endorsement of extreme physical restrictions was entitled to little

weight.

Next, plaintiff argues that the ALJ erred by failing to explicitly discuss each of the factors listed in 20 C.F.R. § 404.1527(c) after declining to give Dr. Hoffmann's opinion controlling weight. Although it is true that the ALJ did not explicitly discuss each of these factors, plaintiff has failed to show that the outcome here would be any different if the case was remanded for this purpose. *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) ("[W]e will not remand a case to the ALJ for further specification where we are convinced that the ALJ will reach the same result."). As previously noted, plaintiff had only a brief treatment relationship with Dr. Hoffmann when he completed his May 2015 RFC assessment, having seen him only three times before. While Dr. Hoffmann purportedly held himself out to be a Lyme specialist, plaintiff also presented no evidence that Dr. Hoffmann actually had training in infectious diseases or rheumatology (or any other special training regarding Lyme's disease), and her counsel could not point to any such qualifications when asked to do so at the hearing despite being well aware of Hoffmann's testimony on the subject of Lyme disease. Moreover, even if his qualifications could be established, Dr. Hoffmann's opinion was not well supported by objective evidence, nor was it consistent with other evidence in the record, suggesting that plaintiff was not as disabled as she claimed to be. For all these reasons, explicit consideration of the § 404.1527(c) factors would not change the outcome.[4]

Finally, plaintiff argues that the state agency consultants' opinions were "stale,"

---

[4] Nevertheless, should the ALJ find it appropriate to consider these factors in conjunction with plaintiff's possible mental health limitations on which this matter will be remanded, the court is certainly not precluding him or her from doing so.

because they did not account for evidence later entered into the record. She further maintains that the ALJ should not have drawn any conclusions from later received medical records without first calling for review and interpretation by a medical expert. Although an ALJ *may* err by relying on an assessment where the record contains "new, significant medical diagnoses [that] reasonably could have changed the reviewing physician's opinion," *Moreno v. Berryhill*, 882 F. 3d 722, 728 (7th Cir. 2018), whether remand is actually required is case-specific. As the Seventh Circuit recently observed, "[i]f an ALJ were required to update the record any time a claimant continued to receive treatment, a case might never end." *Keys v. Berryhill*, 679 F. App'x 477, 481 (7th Cir. 2017) (citing *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004)). Here, plaintiff does not point to any evidence in the record showing that her physical condition worsened significantly after the state agency physicians rendered their opinions. Moreover, the ALJ imposed even more restrictive limitations than recommended by the state agency physicians, among other things, finding that plaintiff required the ability to use a cane over uneven surfaces or long distances and to change position at will from sitting to standing. Because the outcome would not be any different had the ALJ called a medical expert to testify or had the state agency doctors had the later records before them, remand for reconsideration of plaintiff's physical restrictions is not warranted.[5]

---

[5] Again, on remand on plaintiff's mental health limitations, the ALJ will be in the best position to determine whether an additional medical review would be helpful and this decision is not intended to restrict such a determination.

## II.     Treatment of Opinions Related to Mental Limitations

In assessing plaintiff's mental work limitations, the ALJ gave "significant weight" to the assessments of the state disability consultants, Gilyot-Montgomery and Kleinman, and "great weight" to the May 5, 2015 assessment from Psychologist Merrill and Psychiatrist Lehman, which he found to be consistent with those of the state disability consultants. (AR 30-31.)  With respect to Pyschologist Benish, the ALJ declined to afford much weight to his conclusions concerning plaintiff's work-related abilities because Benish used language that was "vague and imprecise."  (AR 31.)  Nonetheless, the ALJ found Benish's statements to be largely consistent with the limitations that the ALJ had already included in his RFC assessment.

In contrast, plaintiff argues that the ALJ's RFC assessment and corresponding hypothetical question to the vocational expert did not account adequately for plaintiff's various psychological limitations, including her difficulties with concentration, attention, pace, and responding to work stress.  Specifically, plaintiff argues that the ALJ:  (1) misinterpreted Lehman and Merrill's opinion that plaintiff would have a "marked" limitation in responding to work pressures; (2) failed to consider Dr. Benish's report properly; (3) erred in relying on the state agency psychologist's opinions, which were outdated in light of Kennedy's April 2015 hospitalization for suicidal ideation; and (4) erred in relying on the state agency psychologist's narrative RFC assessment.

By itself, plaintiff's first argument is unpersuasive. In his decision, the ALJ addressed Lehman and Merrill's opinion concerning plaintiff's ability to respond to work pressures as follows:

> Dr. Lehman and social worker Merrill opined that the claimant would have a substantial loss in her ability to respond appropriately to work pressures in a usual work setting. I do not interpret this to mean that she is incapable of doing so and I presume that if these sources intended such a limitation they would have said so. I have attempted to articulate limits that do in fact limit the claimant to low stress work by determining that the claimant must work in an environment free of fast-paced production requirements, be limited to making only simple work-related decisions or judgments, and limited to work requiring few, if any, changes in the work duties.

(AR 31.) Contrary to the ALJ's finding, plaintiff argues that Lehman and Merrill's conclusion that plaintiff had "marked" limitations in the ability to respond to work pressures actually meant that plaintiff had an "*inability* to function in that area." (Plt.'s Br. (dkt. # 10) 30.) (emphasis added). As the ALJ noted, however, if Lehman and Merrill had meant to say that, then they would have at least checked the box marked "extreme." Instead, they indicated that plaintiff had a "substantial loss" in her ability to respond to work pressures effectively, thus implying that plaintiff had *some* remaining ability to do so. Regardless, it was not unreasonable for the ALJ to draw that inference on this record.

More troubling, however, is the ALJ's handling of Dr. Benish's report. After noting that it was unclear what Benish meant when he said that plaintiff would have "significant" problems in concentration, attention, and work pace, the ALJ purported to account for those problems in his RFC assessment by limiting plaintiff to simple, routine and repetitive tasks, with only simple judgments or decisions, and no fast-paced production. As plaintiff points out, however, the ALJ never even mentioned some of Benish's more significant findings, including: (1) that plaintiff admitted having had visual and auditory hallucinations; (2) that she had "persistent and recurrent" episodes of depersonalization

and derealization, during which she had altered perceptions, distorted sense of time, and felt detached from her body and her surroundings; and (3) that she suffered from delusions lasting more than a month at a time. Given these findings, plaintiff rhetorically (and persuasively) asks on what basis did the ALJ conclude that plaintiff can concentrate and attend sufficiently to perform even simple, routine work tasks?

In response, the Commissioner notes that the state agency psychologists both "considered" Benish's report and concluded it supported only "moderate" limitations on plaintiff's ability to concentrate, pay attention, and maintain work pace. Thus, by crediting the state agency psychologist's opinions, the Commissioner argues, the ALJ accounted for Benish's opinions, albeit indirectly. The problem with this argument is that the record does not disclose what, if anything, the state agency psychologists thought of Benish's report. Dr. Gilyot-Montgomery also stated that she had given "some weight" to Benish's statement of plaintiff's work abilities, but it is uncertain whether she credited his findings concerning hallucinations, delusions, and periods of detachment, and if not, why she disagreed with those findings. (AR 116.)

Thus, like the ALJ's decision itself, it is unclear whether the state agency psychologists simply ignored Dr. Benish's findings concerning plaintiff's diagnoses and symptoms, whether they found his findings incredible, or whether they accounted for his findings when they performed their own assessment of plaintiff's abilities. It is well-settled that an ALJ may not ignore a line of evidence that contradicts his findings. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001) ("[A]n ALJ may not ignore an entire line of evidence that is contrary to her findings, rather she must articulate at some minimal level

her analysis of the evidence to permit an informed review.") (internal quotations omitted); *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994) ("Although a written evaluation of each piece of evidence or testimony is not required, neither may the ALJ select and discuss only that evidence that favors his ultimate conclusion."). Because some of the findings in Dr. Benish's report -- if credited -- arguably supported more severe limitations than the ALJ and the state agency psychologists found, the ALJ was obliged to address them.

This is even more true, when it comes to an ALJ's attempting to formulate an RFC that accommodates mental health limitations like concentration, persistence and pace. *See, e.g.*, *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 617 (7th Cir. 2010) (holding that the ALJ should refer "expressly to limitations on concentration, persistence, and pace in the hypothetical in order to focus the VE's attention on these limitations and assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do"); *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019) ("When it comes to the RFC finding, we have likewise underscored that the ALJ generally may not rely merely on catch-all terms like 'simple, repetitive tasks' because there is no basis to conclude that they account for problems of concentration, persistence or pace." (citation and quotation marks omitted)). The Seventh Circuit has held that an ALJ may rely on the opinion of "a medical expert who effectively translated an opinion regarding the claimant's mental limitations into an RFC assessment." *Milliken v. Astrue*, 397 F. App'x 218, 221 (7th Cir. 2010); see also Varga v. Colvin, 794 F.3d 809, 815 (7th Cir. 2015) (("[A]n ALJ may rely on a doctor's narrative RFC, rather than the checkboxes, where that narrative adequately encapsulates and translates those worksheet observations."); *Capman v. Colvin*, 617 F. App'x 575, 579

(7th Cir. 2015) ("The ALJ's RFC findings accurately reflected Lovko's assessment by restricting Capman to simple, routine tasks and limited interactions with others. Both the medical evidence and Capman's testimony support the finding that any limitations in concentration, persistence, and pace stem from Capman's anxiety attacks, which occur when he is around other people. Therefore, the limitations incorporated into the ALJ's RFC findings adequately addressed Capman's deficiencies in concentration, persistence, and pace."); *Saunders v. Berryhill*, No. 17-CV-616-BBC, 2018 WL 4027030, at *5 (W.D. Wis. Aug. 23, 2018), *aff'd sub nom. Saunders v. Saul*, No. 18-2910, 2019 WL 2714329 (7th Cir. June 28, 2019) (rejecting challenge where ALJ relied on medical expert in translating CPP limitation into RFC). Here, however, the ALJ has almost wholly failed to explain how the specific language in the RFC addresses the undisputed, seemingly significant mental health challenges plaintiff appears to face daily, including in particular as to pace and stress.

Finally, even if the state agency psychologists *did* account for Dr. Benish's findings when they formulated their RFC assessment, and even if it was proper for the ALJ to rely on those narrative assessments when formulating his own RFC, the ALJ's RFC did not adequately correspond to those narrative assessments in propounding plaintiff's RFC. In particular, Drs. Gilyot-Montgomery and Kleinman concluded that plaintiff was "capable of sustaining simple, 1-3 step tasks given routine breaks, *untimed tasks* & superficial contact [with] others in a work setting." (AR 114) (emphasis added). Although the ALJ adopted most of these same limitations, the ALJ deviated slightly, changing the requirement of "untimed tasks" to "no fast paced production." But these are not the same thing. In theory, a job might exist that does not require a person to work at a fast pace, but still requires the work be completed on a schedule. The ALJ does not explain why he chose to

include a restriction on "fast paced production," rather than on *any* timed tasks, nor is the path of that reasoning obvious from his decision, particularly given plaintiff's actual psychological limitations as to pace *and* stress.

Accordingly, this case must be remanded for a new mental RFC assessment, free of the errors noted in this decision. On remand, the agency should also obtain updated assessments from its state agency psychologists that take into account the records from plaintiff's April 8-11, 2015, admission to St. Mary's hospital for suicidal ideation. Unlike the records concerning plaintiff's physical condition, these records arguably reveal "significant and new developments in [plaintiff's] mental health" that could change earlier assessment by even the state agency psychologists. *Moreno*, 882 F. 3d at 728 (ALJ erred in relying on psychologist's assessment that predated significant treatment records from clinical psychologist supporting more severe functional limitations).[6]

ORDER

IT IS ORDERED that the decision of defendant Andrew Saul, Commissioner of Social Security, is REVERSED AND REMANDED pursuant to sentence four of 42 U.S.C. 405(g), for further proceedings consistent with this opinion.

Entered this 21st day of November, 2019.

BY THE COURT:
/s/
WILLIAM M. CONLEY
District Judge

---

[6] Although this alone would be unlikely to support remand, it makes sense to require the ALJ to consider the St. Mary's evidence to ensure a complete and accurate record, particularly given the other errors the court has identified.